UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CAUSE NO. 3:10-CV-311 |
| v. | ) | |
| | ) | |
| ARG CORPORATION and NORBERT R. TOUBES, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The United States spent hundreds of thousands of dollars cleaning up hazardous waste at an old factory site in South Bend, Indiana. The government is now looking to stick ARG with the bill because ARG used to own the place. It has brought this suit against ARG under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) seeking to recover the money the Environmental Protection Agency spent on the clean-up. Whether or not the government can recover from ARG depends on whether a "disposal" of hazardous waste occurred while ARG owned the property. The government has filed for summary judgment arguing that the facts show that such a disposal occurred [DE 89]. ARG has also filed for summary judgment arguing that the facts show that a disposal *didn't* occur [DE 86]. It should come as no surprise, then, that I find that this is a disputed issue of fact that will have to be decided at trial. Therefore, for the reasons set forth below, the parties' cross motions for summary judgment are **DENIED**.

# BACKGROUND

I begin with the undisputed facts relevant to these motions.[1] The South Bend Lathe site is a big piece of property - fifteen acres - located in the heart of South Bend's main industrial corridor at 400 W. Sample Street. The main feature of the site was an enormous, 440,000 square foot, industrial building. Originally, the Studebaker Motor Company, whose factory was right next door, operated an engine plant and machine shop at the site. Studebaker went bust and closed down in the 1960s. From the mid-1960s until 2003, the site was owned and operated by a string of corporations that made lathes, industrial presses, and other machine-tooling equipment. The list of owners includes the site's namesake, the South Bend Lathe Company, which, at one point, was the largest lathe manufacturer in the world.

Defendant ARG bought the site on May 30, 2000. ARG owned the site, with one interruption, until December 15, 2006, when it was sold to the City of South Bend. This is the crucial time-period in this case.

At the time ARG bought it, TIMM, Inc. was using the site to manufacture lathes. TIMM continued to operate at the South Bend Lathe site until May 2002, when it was evicted for not paying rent. On May 31, 2002, ARG entered into a land contract with CASA Holdings, Inc. and CARO, Inc. ("CASA/CARO"). CASA/CARO also operated a lathe-making business at the site. ARG contends that, under the terms of the land

---

[1] Unless otherwise indicated, these facts are drawn from the parties' Joint Statement of Undisputed Facts [DE 83].

contract, CASA/CARO owned the site, even though ARG still held title. The government does not dispute this, at least for the purposes of summary judgment [DE 90-1 at 1 n.1]. CASA/CARO began missing payments on the contract, and ARG forced them out in October 2003, regaining ownership of the property [DE 87 ¶ 49]. After October 2003, the South Bend Lathe site was basically unoccupied. ARG did allow David Arias, a mechanic, to operate a small auto repair business in the building in the hopes that he could discourage vandalism. On December 15, 2006, the South Bend Redevelopment Commission purchased the property from ARG.

A few days later, a City of South Bend employee contacted the Environmental Protection Agency to arrange for the inspection of the property [DE 90-1 ¶ 35]. EPA's on-scene coordinator, Ken Theisen, conducted a walk-through of the SBL site on December 20, 2006. *Id.* ¶ 37. He observed enough potentially hazardous material, including what appeared to be friable asbestos and PCB oil, that the EPA's Superfund Technical Assessment and Response Team was called in to conduct an official site inspection. *Id.* ¶ 38.

The EPA conducted the official site inspection on January 18, 2007. The investigation confirmed the presence of hazardous materials at the site. As a result, the EPA authorized a removal action at the site, which took place between June 25, 2007 and August 1, 2007. During the removal, the EPA abated the asbestos in certain areas of the building [DE 90-1 ¶ 57]. It removed 26,000 gallons of PCB oil from five transformers and decontaminated the transformer vault floor where PCB oil had spilled. *Id.* ¶ 58. It

drained and removed four underground storage tanks. *Id.* ¶ 59. The soil around the smallest storage tank was contaminated, so the EPA removed 75 cubic yards of it. *Id.* ¶ 60. The EPA removed hundreds of drums, pails, and other small containers. Some of these were filled with waste paint, oil and solvents. *Id.* ¶¶ 61-63. Finally, the EPA removed a five-gallon pail of mercury switches. *Id.* ¶ 64. All told, the EPA incurred $610,267.45 in direct costs and $375,399.35 in indirect costs during the removal action.

The United States filed this complaint alleging that ARG was liable for response costs under Section 107 of CERCLA [DE 1]. The complaint also alleged that ARG's owner, Norbert Toubes, was liable as a distributee of ARG's assets. The complaint was later amended to allege a piercing the corporate veil claim against Toubes [DE 99].

After several years of complicated proceedings, this case is finally at the summary judgment stage. ARG and the government have filed cross-motions for summary judgment on the government's claim against ARG [DE 86, 89]. I held an oral argument on the motions on May 2, 2014. Both motions are now ripe for disposition.

### ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material facts exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light

most favorable to the nonmoving party. *Id*. at 255.

The government claims that ARG is liable for its response costs under Section 107(a) of CERCLA. To establish liability under that section, government must prove (1) the South Bend Lathe site was a "facility"; (2) there was a release or threatened release of hazardous substances; (3) the release caused the government to incur "response costs"; and (4) ARG is a "responsible person" as defined by CERCLA. *U.S. v. Capital Tax Corp.*, 545 F.3d 525, 530 (7th Cir. 2008). ARG does not dispute three out of the four elements. The parties agree that the site was a "facility"; that there was a threatened release of hazardous substances at the site; and that the government incurred response costs in the course of the clean-up. The only dispute between the parties is over whether ARG is a "responsible person."

The government claims ARG is responsible as a past owner or operator of the site. Under CERCLA, "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" is liable for the Government's response costs. 42 U.S.C. § 9607(a)(2). ARG's liability, then, turns on whether hazardous substances were disposed of during the period ARG owned the South Bend Lathe site.

The government makes two arguments in favor of summary judgement. First it argues that a disposal occurred when fuel oil spilled and contaminated the ground near an underground storage tank. Second, it argues that a disposal occurred when ARG abandoned various hazardous materials inside the factory building.

-5-

ARG argues that there is no evidence that any disposal occurred during its ownership. It disputes the government's claim that there was a spill near the storage tank. And while it acknowledges the presence of hazardous materials inside the factory, ARG argues that, by definition, placing of hazardous waste inside a building doesn't qualify as a "disposal" unless the waste leaked into the environment.

The issue of whether a spill occurred at the underground storage tank is a straightforward question of fact that turns on the sufficiency of evidence. I'll deal with that issue first. After that, I will address the more complicated legal question of whether placing hazardous materials inside a factory qualifies as a disposal under CERCLA.

### A. Spill at the Underground Storage Tank

The government claims there was a disposal at the small underground storage tank when either oil leaked out of a pipe or the tank overflowed. If that's what happened, there is no legal issue. It would be a disposal. "Disposal" is defined as the "discharge, deposition, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters." 42 U.S.C. § 6903(3); 42 U.S.C. § 9601(29). If, as the government maintains, used fuel oil and other substances spilled on the ground near a storage tank, that would unquestionably qualify as a disposal under CERCLA, and ARG would be liable under Section 107(a).

It comes down to a question of fact. On the one hand, the government claims the undisputed evidence demonstrate that the spill occurred. On the other, ARG claims that the undisputed evidence demonstrates that the spill did not occur.

Here's what the government has come forward with. First, Ken Theisen of the EPA testifies in a sworn declaration that he was working on an adjacent property in 2004 when he happened to peer through a fence and see a pipe coming out of the South Bend Lathe building [DE 90-6 ¶ 8]. The pipe drained into what Theisen assumed was an underground storage tank. *Id.* He says he was able to see dark staining on the ground near the pipe, suggesting either the pipe leaked or the tank had overflowed. *Id.*

Theisen then conducted the EPA's inspection of the South Bend Lathe site in 2006. He attests that the pipe he saw in 2004 was still there in 2006. *Id.* ¶ 9. The pipe started inside the building with a homemade funnel, and then exited the building where it connected to the underground storage tank. *Id.* He again saw dark staining on the ground near where the pipe connected to the tank. *Id.* The government believes the pipe was being used by auto mechanic David Arias to dispose of his shop's waste. The government argues the leak must have occurred sometime after 2001 because TIMM had cleaned up the site in 2001 at the behest of the Indiana Department of Environmental Management [DE 87-4]. So, presumably, the stain Theisen saw was of recent vintage.

In addition to Theisen's testimony, the government points to a 2006 soil analysis that shows that the soil around the tank contained hazardous substances like PCBs,

barium, lead, phenanthrene, and xylenes [DE 83-22 at 24, 50, 58, 64]. The storage tank also contained PCBs, barium, lead, phenathrene, and xylenes [DE 83-15 at 32, 34, 36, 50]. So, putting the pieces together, the government argues that Theisen's testimony indicates that *something* spilled near the storage tank, and the soil testing indicates that what spilled contained hazardous materials. Therefore, there was a "disposal."

ARG has come forward with its own evidence. It does not dispute that the soil surrounding the underground storage tank was polluted, but it maintains that the soil didn't become that way during its ownership. First, as ARG points out, the soil sampling data does not establish that a spill occurred on ARG's watch. The site had been used for heavy industry for decades. ARG points to environmental investigations from the period before ARG's ownership that show that many of the same hazardous substances were in the soil at that time [DE 91 at 15-16; DE 99 ¶ 22] . Further, Robert Newton, who worked at the building from the 1970s until 2003, has testified that the small underground storage tank overflowed several times prior to ARG's ownership of the site, but that it did not overflow after ARG bought the site [DE 90-3 at 25-26, 28]. The soil pollution could readily have been caused by the prior overflows.

As for Theisen's testimony, it suggests, but does not establish, that the underground storage tank was in use during ARG's ownership. ARG's has come forward with evidence disputing this . First, witnesses have testified that the underground storage tank was not used after 2000 [DE 87 ¶ 22, 36; DE 90-3 at 6; DE 90-4 at 21-22]. Further, the tank was drained of much of its contents around that time, so it

was unlikely to overflow after that [DE 90-4 at 22]. Moreover, as noted above, the tank had overflowed many times. So if Theisen saw dark staining in the soil near the tank, it could have resulted from one of these earlier incidents. The IDEM report is not dispositive in that regard as it's not clear from the report how thoroughly TIMM cleaned up the particular spot. Finally, ARG is dubious of Theisen's testimony, noting that the pipe he says he saw was not mentioned in any of the myriad reports the EPA filed while inspecting and remediating the property, nor was it depicted in any photograph.

This is simply a disputed issue of fact that will have to be decided at trial. The government introduced evidence that a spill occurred. ARG has countered with evidence suggesting that a spill did not occur. The government's evidence is strong, but not overwhelming. ARG's is weaker, but enough to avoid summary judgment.

**B.    Disposal inside the South Bend Lathe Building**

The government contends that, even if it cannot prove that a disposal occurred in the soil near the storage tank, it is entitled to summary judgment for a different reason. The government argues that the facts show that a disposal occurred inside the South Bend Lathe factory. The key fact here is undisputed: the South Bend Lathe building was full of hazardous materials. So the crucial question is a legal one: did placing those materials inside the building qualify as a "disposal" under CERCLA.

"Disposal" is defined, in part, as the "placing of any solid or hazardous waste in or on any land or water so that such . . . solid waste . . . may enter the environment or be

emitted into the air or discharged into any waters." 42 U.S.C. § 6903(3). The government argues that the term "land" doesn't just mean the ground or soil, but includes the interior of a building. There is case law from district courts supporting this interpretation. *See Amland Properties Corp. v. Aluminum Co. of America,* 711 F. Supp. 784, 792 (D. N.J. 1989) ("it is clear that Congress intended the term 'land' to encompass buildings and other types of real estate") (citing *BCW Associates Ltd. v. Occidental Chemical Corp.*, No. 86-5947, 1988 WL 102641 (E.D. Pa. Sept. 29, 1988). The government suggests, in its strongest version of this argument, that merely placing hazardous substances inside a building constitutes a "disposal" within the meaning of CERCLA because there is a chance that the substances could enter the environment. *Id.*

ARG argues for a different interpretation of the term "disposal." In its view, "land" means land, as in the soil. So there is only a disposal if there's been an actual spill into the soil, air, or water. As long as the hazardous waste is stored inside and doesn't escape into the environment, there is no CERCLA liability. ARG primarily relies on a pair of Seventh Circuit cases where the court held that the presence of a hazardous substance (asbestos) inside a factory did not constitute a "disposal" under CERCLA. *Sycamore Indus. Park Associates v. Ericsson, Inc.*, 546 F.3d 847, 851-52 (7th Cir. 2008); *G.J. Leasing Co. v. Union Electric Co.*, 54 F.3d 379, 385 ("the release of asbestos inside a building, with no leak outside . . . is not governed by CERCLA.").

Neither side has this quite right, though the government is closest. ARG would require an *actual* release into the environment before an owner could be liable as a

potentially responsible party. But the Seventh Circuit in *Ericsson* clearly contemplated liability for a disposal attaching with the *threat* of a release into the environment. *Ericsson,* 546 F.3d at 851-52 (holding that the release of asbestos inside a building is not a "disposal" so long as there is "no real threat" that the asbestos would enter the environment.). This tracks with the statutory definition of the term, which provides that a disposal occurs when hazardous waste is placed in such a way that the waste "*may* enter the environment." 42 U.S.C. § 6903(3). So the government does not have to prove that the hazardous substances actually leaked out of the building.

But *Ericsson* equally dooms the government's favored interpretation, at least in its strongest form. A disposal requires the "real threat" that the hazardous substances leave the building. *Id.*; *see also G.J. Leasing,* 54 F.3d at 383 (finding no "disposal" under CERCLA when the "only exposure to asbestos [was] within the building."). So merely placing hazardous waste inside the factory, without more, does not constitute a disposal. The waste must be placed in such a way that there is a real threat that they could escape into the environment, air or water. This makes sense. Working factories handle enormous amounts of potentially hazardous materials everyday. If the bare possibility that something bad could escape was sufficient to qualify as a "disposal" under CERCLA, there would be no way to avoid liability.

Two cases from the Northern District of Illinois take what I see as the correct approach. *Premium Plastics v. LaSalle National Bank*, involved a plastics factory that utilized hazardous chemicals like benzene and toulene in its manufacturing process. 904

-11-

F. Supp. 809, 813 (N.D. Ill. 1995). The plaintiff produced evidence that the chemicals regularly spilled onto the factory floor. *Id*. The defendant moved for summary judgment on the grounds that a spill inside a factory is not a "disposal" under 107(a) of CERCLA. The court denied summary judgment saying it was a question of fact whether the hazardous substances were used in such a way that they could have entered the environment. *Id.* at 814. The plaintiff had set forth facts suggesting that there were cracks in the factory floor through which the chemicals could have found their way into the soil around the factory. *Id.* The same is true in *U.S. v. Saporito*, another case involving chemical spills inside a factory. 684 F. Supp. 2d 1043, 1055 (N.D. Ill. 2010). The court held that it was a question of fact whether there was a risk that the chemical spills could have left the inside of the facility as the evidence showed that the factory floor was corroded to the point where soil was exposed and a jury could find there was a chance that the chemical spills could have entered the environment that way. *Id.* at 1055-56.

So, is there evidence of a real threat that hazardous waste stored inside the South Bend Lathe building could have entered the environment? Yes, plenty. The interior contained hundreds of small containers and barrels, many dilapidated and containing hazardous substances like PCBs [DE 83-23 at 6; DE 90-6 ¶¶ 12-13]. There were piles of friable asbestos, knocked down by vandals, strewn throughout the building [DE 90-6 ¶ 7]. And there were pools of PCB oil in a basement vault that had leaked out of transformers [DE 90-5 at 7-8]. Meanwhile, the building was old and dilapidated with

broken windows, cracks in the walls, and holes in the roof [DE 83-15 at 10; DE 90-2 at 16]. After CASO/CARO stopped operations in 2003, the site was more-or-less abandoned, and vandals had the run of the place [DE 90-2 at 9]. Given this evidence, it is reasonable to conclude that hazardous waste could have found its way into the environment, either by getting washed out in a rainstorm or tracked out by vandals.

On the other hand, ARG has introduced enough countervailing evidence to make this a disputed issue of fact. ARG primarily points to the gigantic scale of the building. The factory was the size of seven and half football fields and took up several city blocks. So the degree of threat posed by the debris depended upon its location within the factory. If a pile of asbestos insulation had fallen down in the middle of the factory, the chances were still quite remote it could make its way outside. Moreover, the factory floor was between 12 and 24 inches of solid concrete [90-3 at 84; 90-4 at 32]. So it is not likely that any spills were going to travel through that floor to reach the soil. This is especially true for the transformer vaults, which had a secondary containment unit made up of another three feet of concrete [90-4 at 123-124]. There is also testimony calling into question just how truly dilapidated the building really was [90-3 at11-12, 23]

So, once again, there is evidence on both sides of the questions and the issue will have to be decided at trial.

### C. Damages

There is one final issue that bears addressing: damages. The government's damages are not relevant to the issue of liability and will not become relevant unless

and until the government wins at trial. The parties, however, have a dispute over what the government is entitled to recover in the event that it prevails. The issue will have to be decided at some point and is fully briefed now, so I might as well save time by addressing it here, even though it is not necessary for these present motions.

The government seeks to recover $610,267.45 in direct response costs, $375,499.45 in indirect costs, and prejudgment interest. ARG disputes these figures, arguing that there are issues of fact regarding whether the costs the government incurred were truly necessary.

Unfortunately for ARG, necessity is irrelevant. Under § 107 of CERCLA, a potentially responsible party is liable for *all* cleanup costs, regardless of necessity, that are consistent with the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(A)-(B); *Niagra Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 136 (2d Cir. 2010); *Illinois v. Grigoleit*, 104 F. Supp. 2d 967, 980 (C.D. Ill. 2000). This includes indirect, as well as direct costs, as the indirect costs reflect a portion of the EPA's administrative overhead costs. *See, e.g., United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1502-03 (6th Cir. 1989) ("indirect costs are part and parcel of all costs of the removal action"). The government's costs are presumed to be consistent with the National Contingency Plan and the burden is on the defendant to demonstrate inconsistency. *Niagra Mohawk*, 596 F.3d at 137. To do so, a defendant must show that the government acted arbitrarily and capriciously in choosing a particular response action. *United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir. 1992).

So, if this case gets to the damages phase, ARG will not be able to challenge the necessity of the government's damages. Nor will it be able to challenge those damages' consistency with the National Contingency Plan. That's because ARG has already admitted, in an answer to a request for admissions, that the government's costs were consistent with the national plan (DE 52-5). Answers to requests for admission are binding judicial admissions that cannot be controverted at trial. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996). So, in the damages phase of the trial, if the United States can prove it actually incurred the costs it is seeking, it will be entitled to recover them. The government has provided evidence of its expenditures at the site, but I am going to hold off on further deciding the damages issue until it becomes necessary to do so at trial.

## CONCLUSION

ARG's motion for summary judgment is **DENIED**. The United States' motion for summary judge is also **DENIED**.

**SO ORDERED**.

ENTERED: June 27, 2014.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT